# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

vs.                                            No. CR 07-63 MCA

**CHRISTOPHER A. LANDELL**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Christopher A. Landell's *Motion for Suppression of Evidence and Incorporated Memorandum in Support Thereof* [Doc. 27] filed on April 12, 2007.  The Court held an evidentiary hearing on these motions in Las Cruces, New Mexico, on May 22, 2007, at which Defendant and counsel were present.  Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court grants Defendant's motion and suppresses all evidence resulting from the illegal search and seizure for the reasons set forth below.

I.     **FINDINGS OF FACT**

      A.     **The Port of Entry**

      1.     The State of New Mexico has enacted a regulatory scheme that generally requires commercial carriers entering or leaving New Mexico to stop at its ports of entry and

authorizes state employees assigned to those ports of entry to inspect commercial vehicles and their documentation to determine whether the vehicles, drivers, and cargo are in compliance with relevant state and federal laws regarding public safety, health, and welfare. See generally N.M. Stat. Ann. § 65-5-1 (Michie 2003).

2.      In accordance with this regulatory scheme, the Motor Transportation Division (MTD) of the New Mexico Department of Public Safety (NMDPS) operates a permanent port of entry on Interstate 10 near Lordsburg, New Mexico, and New Mexico's western border with Arizona.

3.      On or about the afternoon of October 6, 2006, Defendant Christopher A. Landell and a female passenger were traveling eastbound on Interstate 10 in a tractor-trailer rig carrying an enclosed trailer known as a "dry box."

4.      During this eastbound journey, Defendant drove his tractor-trailer rig into the Lordsburg port of entry on Interstate 10, thereby making his vehicle and paperwork available to MTD employees for a safety inspection at the port of entry.

5.      While at the Lordsburg port of entry, Defendant also purchased a permit and paid the road tax which allowed him to legally drive his tractor-trailer rig through the State of New Mexico on Interstate 10.

6.      Defendant received and retained a receipt for this purchase which evinced that he passed through the Lordsburg port of entry as required by state law.

**B.**     **The Traffic Stop**

7.     After stopping at the Lordsburg port of entry, Defendant resumed his eastbound journey on Interstate 10 and drove through a construction zone a few miles east of the port of entry.

8.     In the construction zone, the highway was reduced to one lane and the speed limit was reduced from 65 miles per hour to 45 miles per hour.

9.     At the time Defendant was traveling through the single-lane construction zone, other commercial vehicles were traveling in front of him and behind him in close proximity.

10.     MTD Officers Leticia Lopez and Charles Madrid were standing beside the construction zone in uniform next to their marked police vehicle in view of Defendant's tractor-trailer rig and the other approaching vehicles on the highway.

11.     There was nothing to indicate to Defendant or other drivers that the site of the officers' patrol constituted a temporary port of entry or checkpoint of any kind; rather, the officers appeared to be on a routine traffic patrol.

12.     During this patrol, Officers Lopez and Madrid initiated a traffic stop of Defendant's tractor-trailer rig as it passed through the single-lane construction zone.

13.     Defendant complied with the officers' commands to pull over for a traffic stop by parking his tractor-trailer rig beside the highway in a safe location and exiting the cab of the tractor to greet the officers in a non-threatening manner as they pulled up behind him in their patrol vehicle.

14.     At all times during the traffic stop and the events that followed, Defendant and his passenger complied with the officers' commands and did not present any specific, articulable threat to the officers' safety.

15.     Defendant and his tractor-trailer rig were not free to leave at any time during the traffic stop or the events that followed.

16.     After the officers parked their patrol vehicle behind Defendant's tractor-trailer rig, Officer Madrid stayed with that vehicle while Officer Lopez approached Defendant, identified herself as an MTD officer, and told him that she pulled him over for speeding.

17.     Defendant responded by stating that he was not speeding and that the officers must have mistaken his vehicle for another vehicle; Defendant also asked to see the digital readout from the laser device allegedly used to measure his speed, but the officers did not show it to him.

18.     At the hearing on May 22, 2007, neither Officer Lopez nor Officer Madrid provided credible and reliable evidence to establish a reasonable suspicion that Defendant was speeding or was engaged in any other traffic or equipment violation at the time they initiated the traffic stop.

19.     While Officer Lopez initially testified that Defendant's tractor-trailer rig was traveling at 61 miles per hour, I do not find this testimony to be credible because the officer gave inconsistent statements, was heavily reliant on her notes, and later admitted that she did not know the basis for her testimony about Defendant's speed because Officer Madrid was operating the laser device through which Defendant's speed allegedly was measured.

-4-

20.     During his testimony at the hearing on May 22, 2207, Officer Madrid did not credibly recall or describe the observations that led him to suspect that Defendant's vehicle was speeding or engaged in any other traffic or equipment violation; his testimony on this subject was largely prompted by leading questions from the prosecutor, and even with such prompting the officer could not recall such details as Defendant's exact speed as measured on the laser device, how many other commercial vehicles were around him at the time, or whether he issued a traffic citation to Defendant.

21.     Officer Madrid and Officer Lopez provided inconsistent testimony about whether Defendant was given a citation for speeding.

22.     Officer Lopez contradicted herself regarding the issuance of a citation.  Officer Lopez was asked if she wrote out a speeding ticket; and in response thereto, she stated she did.  She then stated that she issued Defendant a written warning.  When asked to produce a copy of the citation or warning, she then changed her testimony and stated, "I am going to say that I did not remember it.  I did not issue a citation."   Officer Lopez later testified that it was Officer Madrid's decision not to issue a speeding citation.

23.     Officer Madrid recalled few details of the traffic stop and, after reviewing a police report, testified that Officer Lopez issued Defendant a speeding citation and a citation relating to a logbook violation.

24.     I find such testimony of Officers Madrid and Lopez wholly unreliable for purposes of determining whether there was any reason for the officers to suspect that Defendant was speeding or whether a speeding citation was ever issued.

25.     The Government produced no corroborating evidence to document the officers' claims that Defendant was speeding at the time Officers Lopez and Madrid observed him; in particular, there is no record that a traffic citation or a logbook citation was ever issued, and there is no documentation of the laser device's calibration or results.

26.     No written traffic citation or commercial vehicle inspection report was disclosed to counsel as of the date of the hearing on May 22, 2007, or introduced into evidence at that hearing.

27.     Officer Lopez also testified that the search and seizure of Defendant and his tractor-trailer rig were recorded on a camera mounted in her patrol vehicle as well as on her belt recorder; however, such recordings, if they exist, were not disclosed to counsel or introduced into evidence as of the date of the hearing on May 22, 2007.

28.     Based on the totality of the circumstances known to the officers at the time they initiated the traffic stop and supported by credible evidence tendered at the hearing on May 22, 2007, the officers lacked reasonable suspicion or probable cause to seize Defendant or to search his trailer.

## C.     The Roadside Inspection

29.     After Officer Lopez initially told Defendant that he was speeding and listened to his response, the officers abandoned any effort to cite Defendant for speeding and instead began an improvised roadside inspection of Defendant's paperwork and tractor-trailer rig.

30.     This improvised roadside inspection prolonged the duration of Defendant's seizure beyond the length of time reasonably necessary to complete a traffic stop and

expanded the scope of the officers' search beyond the areas of inquiry that are covered during a traffic stop.

31.     Officer Lopez initially testified that the decision to expand the stop into a roadside inspection was both hers and Officer Madrid's, but she quickly changed her answer to say that this decision was hers alone; I find such inconsistent testimony to be wholly unreliable for purposes of determining whether the officers were following any type of standard procedure in transforming the traffic stop into a roadside inspection.

32.     Officers Lopez and Madrid, as well as their supervisor, Sergeant Robert Barrera, indicated during their testimony that it is their practice to conduct some type of roadside inspection during most of the occasions on which they stop a commercial vehicle; however, none of the officers could identify any statute, regulation, or written policy which sets forth the specific parameters that limit their discretion in performing such roadside inspections during traffic stops or provide notice of these specific parameters to members of the commercial trucking industry.

33.     The officers' testimony also indicates that it is their practice to perform such roadside inspections without reasonable suspicion or probable cause to prolong the stop for that purpose, and regardless of whether the vehicle they stop has documentation evincing that it has recently completed a similar inspection at the port of entry or elsewhere; this practice places no limit on the number of times the officers may inspect the same vehicle, nor does it limit such inspections to those instances where the officers have reasonable suspicion or probable cause to believe a safety or equipment violation is occurring or has occurred.

34.     In this case, the officers did not follow the State of New Mexico's statutory procedures for conducting a traffic stop or a warrantless safety inspection of a closely regulated industry, and they exercised unlimited discretion in choosing the time, place, and scope of their roadside inspection of Defendant's tractor-trailer rig.

35.     During the first phase of this improvised roadside inspection, Officer Lopez ordered Defendant to produce all his credentials and paperwork, including his commercial driver's license, his logbook, the registration for the tractor-trailer rig, the bills of lading for the trailer's cargo, and the receipt for the permit Defendant had just purchased a few minutes earlier at the port of entry.

36.     The officers found nothing suspicious or threatening about Defendant's credentials or his demeanor, and the officers' check on his name and vehicle revealed no outstanding warrants, stolen-vehicle reports, or other indicators of criminal activity.

37.     Defendant also produced his bills of lading indicating that his trailer was carrying boxes of furniture for a furniture company; based on these bills of lading and the other information known to them before they opened and inspected the trailer's interior, the officers had no reason to suspect that these bills of lading were inaccurate or that the trailer's cargo was unsafe.

38.     Although the officers did not communicate directly with the staff at the port of entry concerning Defendant or his tractor-trailer rig, Defendant's disclosure of the written receipt from the port of entry notified the officers that Defendant had in fact stopped his tractor-trailer rig at the port of entry; thus, the officers had no reason to suspect that he had

-8-

evaded the port of entry, refused to submit to a port-of-entry inspection, or otherwise engaged in any suspicious activity while at the port of entry.

39.    According to their testimony at the hearing on May 22, 2007, the only discrepancies that the officers claim to have found during their roadside review of Defendant's paperwork were that the DOT numbers on his tractor-trailer rig were not preceded by the  letters "U.S.", and that his logbook had not been filled in for the past two days; the officers did not articulate any reasons why these alleged regulatory violations would give them probable cause to place Defendant under arrest or lead them to suspect that there was contraband or other evidence of illegal activity inside his trailer.

40.    Nevertheless, the officers continued their improvised roadside inspection by directing Defendant to drive his tractor-trailer rig forward a short distance and then open the trailer door so the officers could enter and inspect the trailer's interior and cargo.

41.    Based on the totality of the circumstances known to the officers at the time they directed Defendant move the tractor-trailer rig forward and open the trailer's door, the officers lacked reasonable suspicion or probable cause to enter and search the trailer's interior.

42.    Although Officer Lopez initially testified that she returned some of Defendant's credentials to him before the trailer inspection, she also admitted that she never returned his commercial driver's license, and there is no corroborating evidence to show that any written citation or inspection report was ever issued to Defendant.

43.   After Defendant complied with the officers' command to break the seal on the trailer's door and open it, Officer Lopez entered the rear of the trailer and began to search the trailer's interior.

44.   The officers did not articulate any reasons why their inspection of the trailer's interior led them to suspect that the trailer's cargo was being transported in an unsafe condition or in violation of any safety regulations.

45.   The only suspicious circumstance noted by Officer Lopez during her search of the trailer's interior was that some of the boxes in the trailer had a "U Haul" label and colored tape that distinguished them from the rest of the trailer's cargo.

46.   Officer Lopez considered the U-Haul boxes to be inconsistent with Defendant's bills of lading, so she broke through the colored tape which enclosed one of these boxes and looked inside.

47.   Upon opening this U-Haul box, Officer Lopez discovered that it contained marijuana wrapped in cellophane, and she then began to smell the odor of raw marijuana emanating from the inside the box.

48.   The officers could not smell the marijuana before opening the U-Haul box, and they had no specific, articulable reason to suspect that Defendant's trailer was carrying marijuana or other contraband until Officer Lopez entered the trailer's interior and carried out her inspection of the U-Haul boxes.

49.   Officer Lopez's discovery of the marijuana immediately led to the arrest and custodial interrogation of Defendant and his passenger; there was no attenuation between the

initial seizure of Defendant, the search of his trailer, and the ensuing arrest and interrogation that would break the causal links between these events.

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures.  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809-10 (1996).  Thus, Defendant was seized within the meaning of the Fourth Amendment when the officers conducted a traffic stop of the tractor-trailer rig in which he was traveling.  See id.

In this context, Defendant has Fourth Amendment standing to challenge the seizure of his person regardless of whether he had any property interest in the vehicle he was occupying.  See generally United States v. Olivares-Rangel, 458 F.3d 1104, 1112 (10th Cir. 2006); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).  While a defendant generally bears the burden of showing that he has an interest in the trailer portion of a tractor-trailer rig that is protected by the Fourth Amendment, see United States v. Kopp, 45 F.3d 1450, 1452 (10th Cir. 1995), and United States v. Abreu, 935 F.2d 1130, 1133 (10th Cir. 1991), in this case the Government did not contest the issue and it would be unfair for the Court to raise it *sua sponte* after the briefing on the motion and the evidentiary hearing were completed.  See Olivares-Rangel, 458 F.3d at 1106 n.1; cf. United States v. Kennedy, 131

F.3d 1371, 1379 n.9 (10th Cir. 1997) (deciding the issue on other grounds where neither party raised the question of Fourth Amendment standing).

Once Defendant establishes or obtains concessions as to his standing, the burden shifts to the Government to show that the officers' warrantless search and seizure was reasonable, *i.e.*, that they fit under one or more of the recognized exceptions to the Fourth Amendment's warrant requirement. See United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994); United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). In this case, the Government has failed to meet its burden of proof on a number of alternative grounds.

### A.    The Traffic Stop

I first consider whether the officers' actions fell within the Fourth Amendment's boundaries for conducting a warrantless traffic stop. Ordinarily, the seizure occasioned by a routine traffic stop is justified at its inception "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).

In this case, however, the Government has not met its burden of proving that the traffic stop was justified at its inception because the officers failed to produce sufficient, credible evidence to establish a reasonable suspicion that a traffic or equipment violation had occurred or was occurring at the time they directed Defendant to pull over. Officer Madrid allegedly was operating the laser device through which the speed of Defendant's tractor-

-12-

trailer rig was measured, yet even after being prompted by the prosecutor's numerous leading questions he could not recall what speed the laser device recorded or other important details relating to the traffic stop. Officer Madrid's testimony was inconsistent with Officer Lopez's testimony as to whether a speeding citation or warning citation was ever issued or which officer made the decision about whether to issue it, and Officer Lopez changed her answers so many times during her testimony that I find it wholly unreliable for purposes of determining whether Defendant was in fact speeding or was ever going to be cited for speeding or be given a warning.[1]

In addition, there was no documentation to corroborate the officers' testimony about whether Defendant was speeding. The surrounding circumstances do not support the plausibility of such testimony because the presence of other vehicles in the single-lane construction zone would have made it difficult for Defendant to travel at an excessive speed without colliding with them, and the vehicles in front of him would have a natural tendency to slow down as soon as the officers or their patrol vehicle came into view.

The uncorroborated testimony of a witness who cannot credibly and consistently recollect the details of a traffic stop is not sufficient to meet the Government's burden of proving that the stop was founded on reasonable suspicion or probable cause. See United States v. Variste, No. CR 06-1349 BB, Doc. 91 (D.N.M. filed Feb. 27, 2006) (unpublished

---

[1]In rejecting the officers' testimony as it pertains to the speeding allegations, I need not determine whether the defects in such testimony were the result of intentional misrepresentation or just a failure to accurately recall what happened due to lack of adequate preparation for the hearing. In either case, the Government failed to meet its burden of proving that the stop was founded on probable cause or reasonable suspicion.

order granting suppression).  And where neither of the two officers involved in the stop have provided credible and reliable testimony on this subject, the shortcomings in their testimony cannot be overcome by means of the "fellow officer" rule.  See Shareef, 100 F.3d at 1505-06.

The Government's failure to meet its burden of proving that the traffic stop was justified at its inception compels the conclusion that the ensuing search and seizure was unreasonable and in violation of the Fourth Amendment.  Nevertheless, for purposes of clarifying the record I shall also consider Defendant's alternative argument that even if the officers had a basis to stop him for speeding, they exceeded the permissible scope of a traffic stop and did not develop  reasonable suspicion or probable cause to prolong the stop in order to search for evidence of illegal activity inside Defendant's trailer.

Assuming for purposes of analysis that an officer has probable cause to issue a traffic citation, the Fourth Amendment permits the officer to engage in a number of relatively brief activities before that citation is issued.  For example, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).  But the general rule is that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license,

registration, and insurance information have been reviewed and found to be in proper order. See Hunnicutt, 135 F.3d at 1349.

The Fourth Amendment provides two relevant exceptions to this general rule. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." Hunnicutt, 135 F.3d at 1349. In developing such suspicions, officers are entitled to use the information that is lawfully made available to them during the permissible scope and duration of the traffic stop. See, e.g., Illinois v. Caballes, 543 U.S. 405, 409-10 (2005) (permitting canine inspections of a vehicle's exterior to occur during lawful traffic stops as long as they do not prolong the duration of the stop); United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007) (permitting questions about the presence of weapons or contraband during a lawful traffic stop so long as they do not prolong the duration of the stop). Thus, for example, an officer might walk around a vehicle's exterior looking for equipment violations or safety hazards in plain view while another officer is performing the tasks necessary to issue a traffic citation for speeding.

Under the second exception, "further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349. Thus, after issuing the traffic citation and returning the driver's property, officers may ask the driver for permission to continue their questioning. See, e.g., United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).

-15-

In this case, however, the officers quickly abandoned the standard procedures of a traffic stop without issuing a citation, and without returning Defendant's driver's license to him or otherwise indicating that he was free to leave.  Under these circumstance, there was never an opportunity for the initial detention to become a consensual encounter.

In addition, the officers' initial review of Defendant's paperwork and his vehicle's exterior during the first phase of the stop did not give them reasonable suspicion or probable cause to prolong Defendant's seizure or search the interior of his trailer.  On this point, the Government concedes in its response brief that it would "not seek to justify the inspection of defendant's trailer based upon the existence of probable cause that he was involved in criminal activity."  [Doc. 28, at 3.]  Similarly, there was no specific, articulable threat to the officers' safety or the safety of others that could justify the trailer inspection or the prolonged detention.

Other than the alleged speeding violation, the only discrepancies that the officers claim to have identified before entering and searching the trailer's interior were the missing "U.S." letters preceding the tractor-trailer rig's DOT number and the missing logbook entries for two days.  Both the speeding violation and the record-keeping violations identified by the officers appear to fall into the category of penalty-assessment misdemeanors under N.M. Stat. Ann. §§ 66-8-116 or 66-8-116.2 (Michie Supp. 2006), which can be charged by means of a uniform traffic citation under N.M. Stat. Ann. § 66-8-123 (Michie 2003).  Even assuming for purposes of argument that the officers could have prolonged the stop for the period of time necessary to issue a citation for all of these alleged misdemeanors, the officers

-16-

articulated no specific reasons why the missing logbook entries and "U.S." letters led them to suspect that further illegal activity was occurring inside the trailer.

In reaching this conclusion, the Court is mindful of the need to consider the totality of the circumstances rather than viewing each fact in isolation. See United States v. Arvizu, 534 U.S. 266, 273 (2002). But here the totality of the circumstances known to the officers before entering and searching the trailer do not provide an objectively reasonable and articulable suspicion of further illegal activity. There was no testimony that Defendant had an unusually nervous demeanor, that he was traveling at a suspicious hour, that his bills of lading appeared to be inaccurate on their face, that he had any outstanding warrants or criminal history, that his vehicle was reported stolen, or that he had failed to pay the tax or obtain the permit necessary to travel through New Mexico on Interstate 10. Further, the officers knew from his receipt that Defendant had just come from the Lordsburg port of entry and thus had not attempted to evade the State's inspection regime at that port of entry. In light of the above factors, Defendant's mere presence on a "pipeline" route such as eastbound Interstate 10 adds very little to the equation. See United States v. Grant, No. CR 05-2511 JB, 2006 WL 1305037, at *11 (D.N.M. Apr. 10, 2006) (unpublished memorandum opinion and order).

It follows that the search and seizure was not conducted within the permissible boundaries of a warrantless traffic stop. The Government failed to meet its burden of presenting credible evidence that the stop was justified at its inception, and even assuming that there was a lawful basis for initiating the stop, the officers' search of the trailer's interior

-17-

exceeded the permissible scope of a traffic stop without reasonable suspicion or probable cause for doing so.

### B.   The Roadside Inspection

Lacking probable cause or reasonable suspicion to prolong the seizure or search the trailer's interior, the Government falls back on the exception for warrantless inspections of a "closely regulated industry."  Both the Tenth Circuit and this Court have previously upheld the State of New Mexico's regulatory scheme for conducting warrantless inspections of the commercial trucking industry *at its ports of entry* pursuant to the three-part test articulated in New York v. Burger, 482 U.S. 691, 703 (1987).  See United States v. Vasquez-Castillo, 258 F.3d 1207, 1210 (10th Cir. 2001); United States v. Michael, No. CR 06-1833 MCA, Doc. 72 (D.N.M. June 22, 2007) (unpublished memorandum opinion and order).  In the case at bar, the Government seeks to expand this regulatory scheme to permit warrantless roadside inspections of the commercial trucking industry by roving patrols during traffic stops that occur outside the boundaries of the State of New Mexico's ports of entry.

The essential requirements for a warrantless safety inspection of a closely regulated industry under Vasquez-Castillo, 258 F.3d at 1211, include (1) a regulation that "sufficiently inform[s] the commercial property owner that his property will be subject to periodic inspections undertaken for specific purposes," (2) a regulation that notifies "owners as to who is authorized to conduct an inspection," and (3) a regulation that "limit[s] the discretion of inspectors in time, place, and scope."  Id.  While the procedural requirements of state or local law ordinarily are not relevant to determining the reasonableness of a warrantless

search under the Fourth Amendment, see Whren, 517 U.S. at 814-16, such requirements are relevant to the Court's application of the Burger test in this instance, because the state regulatory scheme under which the MTD officers operate defines both the limits on their discretion and the notice provided to the affected industry.

Requiring safety inspections to occur at designated locations such as the ports of entry places more limits on the officers' discretion and provides greater notice to the trucking industry than allowing roving patrols to perform such inspections wherever and under whatever circumstances they please.   Nevertheless, the Fifth Circuit has upheld the constitutionality of warrantless safety inspection schemes in other states that do employ roving patrols for this purpose.  See, e.g., United States v. Castelo, 415 F.3d 407, 411 (5th Cir. 2005) (upholding provisions of Mississippi Code that expressly provided the authority to stop, weigh, and inspect commercial vehicles operating on that state's highways); United States v. Fort, 248 F.3d 475, 482 (5th Cir. 2001) (upholding the provisions of a Texas statute that expressly provided for safety inspections both "on a highway or at a port of entry").   In two cases where neither party challenged the constitutionality of the Kansas regulatory scheme for inspecting commercial carriers, the Tenth Circuit assumed without deciding that such a scheme was constitutional in that state even though it allowed the officer's routine safety inspection to be initiated by means of a roving patrol stop rather than the vehicle's appearance at a port of entry.  See United States v. Burch, 153 F.3d 1140, 1142 (10th Cir. 1998); United States v. Herrera, 444 F.3d 1238, 1244-45 (10th Cir. 2006).

The present case, however, is distinguishable from the above authorities in the following respects.  First, none of these authorities interpreted the specific language of New Mexico's statutory inspection regime, and this language differs significantly from the Kansas, Texas, and Mississippi statutes cited above, which expressly provided that routine safety inspections could be initiated by means of a stop on the state's highways that did not occur at a designated port of entry.

In contrast to these other states, the express language of New Mexico's statutes is directed at inspections that are initiated at designated ports of entry.  See N.M. Stat. Ann. § 65-5-1, 65-1-11 (Michie 2003).  It has been so interpreted by the State's appellate courts, see State v. Clark, 112 N.M. 500, 502,  816 P.2d 1122, 1124 (Ct. App. 1991), and that interpretation was cited in another recent case in this district involving a roving patrol near the Lordsburg port of entry, see Grant, No. CR 05-2511 JB, 2006 WL 1305037, at *7.

Another important distinction between this case and the Kansas, Texas, and Mississippi cases cited above is that those cases all involved situations where the officers initiated the stop for the express purpose of conducting a safety-related inspection pursuant to the state's regulatory scheme for commercial carriers and at least went through the motions of performing a safety inspection up until the time that they developed probable cause to conduct a search for the alternative purpose of locating a controlled substance.  See Burch, 153 F.3d at 1141 ("Trooper Smith's stated  reason for stopping Defendant was to conduct a routine safety inspection of Defendant's commercial vehicle pursuant to Kansas law."); Herrera, 444 F.3d at 1241 (similar); Castelo, 415 F.3d at 410 (noting that the officers

"were designated as a portable scale team and were carrying portable scales at the time of the stop"); Fort, 248 F.3d at 478 (noting the parties' stipulation that the officer "stopped the truck to conduct a routine commercial inspection").

In contrast, the officers in the present case initiated the seizure of Defendant and his vehicle under the guise of a traffic stop based on their contention that he was speeding. Prior to the traffic stop, the officers were parked on the side of the highway watching for speeding vehicles rather than conducting routine safety inspections. After they initiated the traffic stop and engaged Defendant in a colloquy about the alleged speeding violation, the officers abandoned any effort to document or pursue a speeding citation and instead changed the stop's purpose to that of an expansive roadside inspection of Defendant's paperwork and the interior of his trailer.

Thus, the stop in this case not only involved a roving patrol, it also involved a situation where the officers changed the purpose of the stop without first documenting or pursuing the alleged traffic violation for which the stop had been initiated. As noted above, this change in purpose was *not* based on information obtained during the traffic stop which provided reasonable suspicion or probable cause to believe that Defendant committed a felony or that evidence of criminal activity would be found in his trailer.

Under these circumstances, the officers' decision to prolong Defendant's detention without issuing a citation for a motor-vehicle misdemeanor such as speeding under N.M. Stat. Ann. § 66-8-116, or an improper logbook entry under N.M. Stat. Ann. § 66-8-116.2, runs contrary to the standard procedure set forth in N.M. Stat. Ann. § 66-8-123, which

-21-

generally requires the arresting officer to give a copy of the citation to the arrested person and then release him from custody. New Mexico's appellate courts have recently concluded that the cite-and-release procedure set forth in Section 66-8-123 is required under Article II, Section 10 of the New Mexico Constitution, absent "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the additional] intrusion of a full custodial arrest.'" See State v. Bricker, 2006-NMCA-052, ¶¶ 20-30, 139 N.M. 513, 134 P.3d 800 (quoting State v. Rodarte, 2005-NMCA-141, ¶ 14, 138 N.M. 668, 125 P.3d 647).

Ordinarily, federal courts need not consider such requirements of state law in assessing the reasonableness of a search or seizure because the Fourth Amendment permits "an arrest if the officer 'has probable cause to believe that an individual has committed even a very minor criminal offense in his presence.'" Apodaca v. City of Albuquerque, 443 F.3d 1286, 1289 n.2 (10th Cir. 2006) (quoting Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)). In this case, however, such requirements of state law are relevant under the Burger test because the Government is arguing in favor of an inspection regime that is *not* founded on probable cause, and the Court has specifically found that probable cause was lacking at the stop's inception.

Compliance with a standard procedure such as that specified in Section 66-8-123 serves to limit the officers' discretion and enhance the notice to the affected industry by identifying the specific purpose of the stop and defining the sequence of events that officers are to follow in accomplishing its purpose. In contrast, both the roving nature of the officer's

patrol and the change in the purpose of the stop serve to lessen the constraints on the officers'
discretion and call into question whether the State's inspection regime adequately notifies
the commercial trucking industry of such tactics, as required under the Burger test.

The Government seeks to avoid the constraints imposed by N.M. Stat. Ann. §§ 66-5-1
and 66-8-123 by pointing to other New Mexico statutes which provide general enforcement
authority to MTD officers in the field, see id. §§ 65-1-6, 65-1-7, or identify the types of
safety requirements which they may enforce, see, e.g., id. § 65-3-8.  The Government also
cites the statutory definition of "field enforcement" or "in the field," which means "patrolling
of the highway, stopping of commercial motor carrier vehicles or establishing ports of entry
and roadblocks for the purpose of checking motor carriers and includes similar activities."
N.M. Stat. Ann. § 65-1-2(J).

While the latter group of statutes support the general proposition that MTD officers
have the authority to enforce safety requirements in the field by means of traffic stops
founded on probable cause or reasonable suspicion, they do not define or provide notice of
the *specific parameters* under which MTD officers may carry out this enforcement authority
by means of roadside inspections that are conducted *without* probable cause or reasonable
suspicion.  Thus, in citing this group of statutes, the Government fails to recognize an
important distinction between the MTD officers' general enforcement authority, which is
limited by the Fourth Amendment's requirements of probable cause and reasonable
suspicion, and their much narrower authority to carry out warrantless inspections of a closely
regulated industry *without* probable cause or reasonable suspicion.

-23-

If the generic language of Sections 65-1-2(J), 65-1-6, 65-1-7, and 65-3-8 alone was enough to allow the officers to dispense with the requirements of probable cause or reasonable suspicion in all their field enforcement activities, then the exception would swallow the rule and the officers would have virtually unlimited discretion to inspect commercial vehicles whenever, wherever, and however many times they please.  As a matter of federal constitutional law, I reject such a result because it would not comply with the requirements of the <u>Burger</u> test.

As a matter of statutory construction under state law, I also reject such a result because the Government's proposed interpretation of Sections 65-1-6, 65-1-7, and 65-3-8 would conflict with other provisions of the New Mexico statutes as well as the requirements of Article II, Section 10 of the New Mexico Constitution as articulated by the State's appellate courts.  <u>See</u> <u>N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n</u>, 2007-NMCA-010, ¶ 12, 141 N.M. 41, 150 P.3d 991 ("We ascertain the intent of the legislature by reading all the provisions of a statute together, along with other statutes *in pari materia*."); <u>cf.</u> <u>United States ex rel. Attorney General v. Delaware & Hudson Co.</u>, 213 U.S. 366, 408 (1909) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the Court's] duty is to adopt the latter.").

Lacking any specific state law on which to justify the officers' roadside inspection in this case,  the Government's response brief falls back on the existence of a federal regulation, 49 C.F.R. § 396.9, which "authorizes special agents of the Federal Highway administration

to conduct safety inspections of motor carriers' vehicles in operation." V-1 Oil Co. v. Means, 94 F.3d 1420, 1423 (10th Cir. 1996).  In the context of applying the doctrine of qualified immunity in a civil action, the Tenth Circuit concluded in 1996 that there was no clearly established law giving notice to a Wyoming Highway Patrol officer that it was unconstitutional for him to use this federal regulation, in combination with Wyoming statutes and regulations, as the basis for ordering a commercial truck driver carrying hazardous materials to drive to a nearby port of entry for a safety inspection.  See id. at 1428.

I conclude, however, that neither 49 C.F.R. § 396.9 nor V-1 Oil Co. provide sufficient authority to justify the roadside inspection at issue here.  The case at bar presents a different question than V-1 Oil Co. because the doctrine of qualified immunity is not a defense to the application of the exclusionary rule in a criminal proceeding.  In the context presented here, the reasonableness of the officers' roadside inspection of a commercial vehicle does not turn on whether or not the *officers* were on notice of clearly established law defining the constitutional principles governing administrative inspections of such vehicles in Wyoming. Rather, it turns on a *criminal defendant's* "decision to engage in a pervasively regulated business [in New Mexico], knowing that by doing so he would be subject to random warrantless inspections." Herrera, 444 F.3d at 1247.

Nevertheless, the requirement of notice is a common theme that appears in both the doctrine of qualified immunity and in the elements of a warrantless inspection regime for a closely regulated industry under Burger and its progeny.  The purpose of a qualified-immunity defense is to ensure that "'the contours of the right [an officer is alleged to have

violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" V-1 Oil Co., 94 F.3d at 1423 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Similarly, the Burger test is "premised on the fact that the *owner* of the property subject to the search 'cannot help but be aware that his property will be subject to periodic [administrative] inspections undertaken for specific purposes,'" because he or she is "knowingly and voluntarily engaging in a pervasively regulated business" for which there exists "a statutory scheme that puts that individual on notice that he [or she] will be subject to warrantless administrative seizures and searches." Herrera, 444 F.3d at 1246-47 (quoting Burger, 482 U.S. at 703).

Thus, it seems incongruous to conclude, on the one hand, that the law is so unclear that a reasonable police officer would not understand the contours of his or her constitutional authority to conduct roadside inspections without reasonable suspicion or probable cause and, on the other hand, that the same law is so clear that an individual cannot help but be aware that his or her activities are subject to such roadside inspections.  If the law is so unclear that not even a reasonable police officer can be expected to know the contours of his or her authority in this context, then by the same token it is unreasonable to expect the individual against whom that authority is exercised to be on notice of the contours of the Government's regulatory scheme.

Recognizing a similar incongruity, the Tenth Circuit recently rejected the application of the good-faith exception to the exclusionary rule in the context of  a random warrantless administrative search that is subject to the Burger test.  See Herrera, 444 F.3d at 1254.  In

order to "remain true to the general Fourth Amendment principles underlying a valid administrative search," an officer's interpretation of the relevant statutes cannot be "objectively reasonable" for purposes of the good-faith exception unless "it would follow that the party subject to the search, also interpreting that statutory scheme in the same objectively reasonable manner, should have foreseen that that regulatory statute would subject him to such a warrantless administrative search." Id.

As noted above, the Government has not identified any express language in the applicable statutes or regulations which would put a commercial truck driver such as Defendant on notice that the State's safety inspections may be conducted outside the boundaries of a port of entry by roving patrols during a traffic stop that was initiated for some other purpose and did not follow the cite-and-release procedure specified in N.M. Stat. Ann. § 66-8-123.  To the extent the officers were operating under a mistaken belief that the State's regulatory scheme allowed for such actions, the Government has not shown that such a mistaken belief was objectively reasonable or undertaken in good faith.

The officers in this case were not relying on the Legislature's enactment of a statute that a court later declared to be unconstitutional.  See, e.g., Illinois v. Krull, 480 U.S. 340, 349-53 (1987).  On the contrary, New Mexico's statutory scheme has passed constitutional muster *as applied to the State's ports of entry*.  See Vasquez-Castillo, 258 F.3d at 1210. Further, there are reported opinions declining to construe this statutory scheme as a justification for roadside inspections similar to the one at issue here.  See, e.g., Clark, 112 N.M. at 502,  816 P.2d at 1124.  In light of the above authorities,  it is not objectively

reasonable to presume that the Legislature intended to allow such roadside inspections of a trailer's interior and cargo without probable cause or reasonable suspicion based solely on the general enforcement authority provided in N.M. Stat. Ann. §§ 65-1-2(J), 65-1-6, 65-1-7, or 65-3-8, or 49 C.F.R. § 396.9.

A statute or regulation providing only a general authorization to "enforce in the field" or to inspect "vehicles in operation" does nothing to limit the officers' discretion or to provide notice to the affected industry of the permissible boundaries of an inspection with respect to time, place, or duration.  Hence, such generalized legislation cannot meet the required elements of the Burger test.

Indeed, the Government's interpretation of these generic statutes would place them in the same category as the ancient Act of Parliament authorizing indiscriminate general searches by writ of assistance, see 7 & 8 Wm. III, c. 22, § 6 (1696), which the framers of the Constitution sought to abolish by means of the Fourth Amendment.  "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment."  Payton v. New York, 445 U.S. 573, 583 (1980).  At the time the framers adopted the Fourth Amendment,

> [v]ivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law

book," because they placed "the liberty of every man in the hands of every petty officer."

Stanford v. Texas, 379 U.S. 476, 481 (1965) (quoting Boyd v. United States, 116 U.S. 616, 625 (1886)). "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." Delaware v. Prouse, 440 U.S. 648, 661 (1979). For these reasons, the officers' actions in this case do not accord with the original intent of the Fourth Amendment, nor are they based on an objectively reasonable interpretation of New Mexico's regulatory scheme for commercial motor carriers.

### C.   The Exclusionary Rule

In order to invoke the exclusionary rule on Fourth Amendment grounds, Defendant "must demonstrate both actual police misconduct that violated [his] Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct." United States v. Williams, 356 F.3d 1268, 1272 (10th Cir. 2004) (citing United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir.2001) and United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.2000)). "'Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the  taint of the unlawful conduct.'" DeLuca, 269 F.3d at 1132 (quoting Nava-

Ramirez, 210 F.3d at 1131) (citations omitted); see Williams, 356 F.3d at 1273 (citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

In this case, Defendant has demonstrated both a Fourth Amendment violation and an affirmative causal link between that violation and the evidence he seeks to suppress.  Since the officers' traffic stop was not justified at its inception, none of the evidence or information obtained during that stop or the events that immediately followed it (including the search of the trailer's interior and Defendant's arrest) would have come to the attention of these officers during their patrol on Interstate 10 but for their unconstitutional conduct.  Further, even if there were some attenuation between the inception of the traffic stop and the discovery of incriminating evidence inside the trailer, the officers committed an additional Fourth Amendment violation by prolonging Defendant's detention beyond the permissible scope of the traffic stop and searching the trailer's interior without probable cause or reasonable suspicion.  This additional Fourth Amendment violation is directly linked to the discovery of the incriminating evidence in the trailer and Defendant's arrest, and thus there is no attenuation that would dissipate the taint of the officers' unlawful conduct.

Further, the Government has not met its burden of showing that the evidence in question would have been inevitably or independently discovered by means of a lawful safety inspection pursuant to the State of New Mexico's regulatory scheme for commercial motor carriers.  Defendant's cargo already passed through the Lordsburg port of entry and remained undetected before the officers stopped him in the construction zone a few miles down the road, and the State's regulatory scheme does not provide for the type of roadside

trailer inspection at issue here when performed by officers on roving patrol during a traffic stop that fails to generate any reasonable suspicion or probable cause to prolong the detention or search the trailer.

Finally, I find that applying the exclusionary rule in this case furthers the rule's intended purpose and effect of deterring lawless police conduct.  See Herrera, 444 F.3d at 1248-49.  The Fourth Amendment violations that occurred in this case were not the result of a single officer's objectively reasonable but mistaken reliance on the authority granted by a judge or legislative body.   Instead, these violations suggest a more fundamental misunderstanding of basic Fourth Amendment principles that may affect a significant segment of the New Mexico Department of Public Safety's Motor Transportation Division, as evidenced not only by Sergeant Barrera's testimony in this case, but also by the conduct of other officers in previous cases.  See, e.g., Grant, No. CR 05-2511 JB, 2006 WL 1305037 at *11; Variste, No. CR 06-1349 BB, supra, Doc. 91.  Accordingly, the evidence at issue in this case must be suppressed pursuant to the exclusionary rule.

## III.   **CONCLUSION**

For the foregoing reasons, the Court grants Defendant's motion and suppresses all evidence obtained as a result of the illegal search and seizure in this case, including the marijuana found in the trailer, its packaging, and any statements made by Defendant during the custodial interrogation that followed his arrest.

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion for Suppression of Evidence and Incorporated Memorandum in Support Thereof* [Doc. 27] is **GRANTED**.

**SO ORDERED** this 22nd day of June, 2007, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge